425 F.Supp. 40 (1977)
Mary A. GRAVES and Gary Morris, Individually and on behalf of all other persons similarly situated, Plaintiffs,
v.
John MEYSTRIK, Director of the Division of Employment Security of the State of Missouri, Individually and in his official capacity, et al., Defendants.
No. 76-336 C (1).
United States District Court, E. D. Missouri, E. D.
January 3, 1977.
Stuart R. Berkowitz, James W. Sherby, Legal Aid Society, St. Louis, Mo., for plaintiffs.
Michael L. Boicourt, Asst. Atty. Gen., Jefferson City, Mo., for defendants.
Before WEBSTER, Circuit Judge, MEREDITH, Chief Judge and WANGELIN, District Judge.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
MEREDITH, Chief Judge.
Plaintiffs, Mary A. Graves and Gary Morris, brought this action on behalf of themselves and as representatives of a class composed of all those persons who have been or in the future will be determined eligible to receive Missouri unemployment compensation benefits and who have been or in the *41 future will be denied benefits without timely and adequate prior notice and opportunity for an evidentiary hearing. On September 22, 1976, this three-judge court ruled that the plaintiffs could proceed as representatives of the above-described class, pursuant to Fed.R.Civ.P. 23(d)(2). The defendants in this action are John Meystrik, Director of the Division of Employment Security of the State of Missouri, and James J. Butler, Carl J. Brown, and George E. Taff, members of the Labor and Industrial Relations Commission of the State of Missouri.
The plaintiffs contend that sections 288.070.3 and 288.070.5, R.S.Mo. 1969, as amended 1973, of the Missouri Employment Security Act, violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Social Security Act, 42 U.S.C. § 503(a)(1) and (3), insofar as unemployment compensation benefits are terminated without notice and opportunity for a prior evidentiary hearing. The plaintiffs seek declaratory and injunctive relief as authorized by 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202 to redress these alleged deprivations of rights.
This matter was tried to the Court without a jury. The Court has been duly informed by stipulation of facts, briefs, exhibits, and depositions. The Court makes the following findings of fact and conclusions of law:

Findings of Fact
1. The Missouri Division of Employment Security (hereinafter Division) is a federal-state-local partnership formed to serve employers and those seeking employment. The Division is comprised of a central office in Jefferson City, Missouri, and forty local offices. The Employment Security Program was established under the provisions of the Wagner-Peyser Act, 1933, and the Social Security Act, 1935. The Division pays unemployment insurance benefits and collects the necessary payroll taxes from Missouri employers in accordance with the Missouri Employment Security Law.
2. Administrative and operating costs of the Division are paid out of federal grants derived from federal taxes paid by employers and made available by Congressional appropriations. Funds for the payment of weekly benefits to qualified workers are collected through payroll taxes paid by Missouri employers, as defined by the Missouri Employment Security Law, and are maintained in the "Unemployment Compensation Fund", which is set aside for that sole purpose, and is administered by the Division.
3. Under the Missouri Employment Security Law, Chapter 288, R.S.Mo. 1969, as amended 1973, the eligibility of a claimant for unemployment benefits is determined on a week-to-week basis. Accordingly, a claimant must file a claim for benefits each week, and a determination of the claimant's eligibility is then made for the particular week claimed.
4. If the claimant is determined eligible and not disqualified for the particular week claimed, he is paid benefits for that week. If he is determined ineligible or disqualified, he is not paid benefits for the week claimed.
5. As a result of the above, there are situations wherein a claimant, who has been determined eligible and paid benefits for certain prior weeks, may be determined to be ineligible or disqualified for a particular later week in which he files a claim because he failed for that week to meet all the requirements in the statute for eligibility.
6. Claimants are given claim cards which may be mailed to the local office for the respective week in which the claimant is filing a claim. Each week that a card comes in, the deputy reviews the card and based upon the information contained therein, makes a determination as to the claimant's eligibility for that particular week.
7. If the information on the claim card clearly indicates that the claimant is eligible for benefits, the deputy will immediately make a determination of eligibility and the claimant will be paid benefits for that week.
*42 8. If the information contained on the claim form for a particular week claimed clearly indicates to the deputy that the claimant is not eligible for that week, the deputy will make a determination of ineligibility and mail same to claimant. As a result of this determination, the claimant will not be paid benefits for the week in which he was found ineligible.
9. If the information contained on the claim card for a particular week, or if any other information which has been received from any other source, raises a question regarding the claimant's eligibility for that week, the claimant is immediately notified by phone or in writing to report promptly to the local office. It is the policy of the Division, and the deputies are so instructed, that at the time the claimant is given such notice to report to the local office, he is also informed as to the specific question which has been raised regarding his eligibility for that particular week.
10. Should the claimant fail to report to the local office as requested, the deputy makes a determination as to eligibility for the week in question based upon the information available to him. If the deputy determines the claimant is eligible, he will receive his benefit check for that week. If the deputy makes the determination that the claimant is ineligible, he will not be paid benefits for that week, but will receive a written determination of his ineligibility from which he has the right to appeal.
11. Since allowance or denial of benefits is determined on a week-to-week basis, a claimant who is denied benefits for a particular week will be found eligible by the deputy for subsequent weeks claimed in which he has been found to meet all the eligibility requirements.
12. If the claimant reports as requested for an interview by a deputy, the deputy affords the claimant the opportunity to rebut the information the deputy has which indicates possible ineligibility. The claimant is given an opportunity to explain or add any facts which relate to his eligibility for benefits for the week or weeks in question. During the interview, the deputy prepares a summary of the interview. The claimant is asked to read it and, if he agrees with the prepared statement, to sign the statement.
13. If additional information is necessary for the deputy to make a proper determination regarding the issue raised, the deputy will attempt to secure it from the interested parties, including the claimant.
14. Based upon the information received by the deputy regarding the question of eligibility for that particular week, the deputy will make a determination as to whether or not the claimant is eligible for the week claimed. If the deputy allows benefits for the week in question, a check for that week will be issued. If the deputy denies benefits for the week in question, the claimant will receive written notice of such denial, and the reasons therefor. Upon receipt of this notice, the claimant has the right to appeal.
15. When unemployment benefits have been allowed by a deputy, any employer who was entitled to notice of the deputy's determination may appeal.
16. Benefits paid to an unemployed claimant may be charged to the tax accounts of his past employers. The amount of unemployment tax an employer pays depends in large measure on the benefits charged to his account.
17. An appeal is a written statement of the reasons why the appellant believes the determination of the deputy is wrong. This written statement can be filed either in person or by mail at the local office of the Division where the determination was made. The address of such local office is shown on the determination. The statement can be written in a letter or on forms which will be furnished by the deputy on request.
18. The procedure for filing an appeal from a deputy's determination is explained on the face of the determination itself.
19. An appeal provides the appellant and all interested parties an opportunity for a complete evidentiary de novo hearing before an appeals referee. Any interested *43 party to the appeal may be represented by an attorney.
20. Notice of the time, date, and place of a hearing are mailed to the appellant and all interested parties several days in advance of the hearing.
21. In those cases where a claimant has appealed, the employer will receive with his notice of the hearing a copy of the appeal filed by the claimant or notice of the issues raised by the appeal. Likewise, in those cases where the employer has appealed, the claimant will receive with his notice of hearing a copy of the appeal filed by the employer or notice of the issues raised by the appeal.
22. During the hearing, each party is permitted to present his testimony and evidence, and each party is permitted to question the opposing party and opposing witnesses. Testimony taken at the hearing is given under oath and recorded either by a shorthand reporter or by a recording machine.
23. Appeals referees hold hearings in the various local offices of the Division for a week at a time, and then return to the central office in Jefferson City to write their decisions, except for certain appeals referees stationed in St. Louis, who hold hearings in the morning and write decisions in the afternoon.
24. Once the decision had been written, a copy is mailed to each interested party to the appeal. It normally takes between one and two weeks from the time a hearing is held until the decision is mailed to all interested parties.
25. The decision consists of a finding of fact and an application of the relevant provisions of the law to the facts. The decision becomes final, unless one or more of the interested parties files an application within ten days following the date of the mailing of the decision to have the decision reviewed by the Labor and Industrial Relations Commission of Missouri. A statement of instructions for filing such an application is mailed with each decision.
26. The Labor and Industrial Relations Commission may allow or deny an application for review. If an application is allowed, the Commission may affirm, modify, reverse, or set aside the decision of the appeals referee on the basis of the evidence previously submitted in the case, or may take additional evidence, or may remand the case to the appeals referee with directions.
27. Any interested party aggrieved by a decision of the Labor and Industrial Relations Commission may secure judicial review of same by filing an action in the appropriate state circuit court.
28. From January 1975 through May 1976, there were 8,545,761 claims for unemployment benefits in the State of Missouri, and from January 1975 through July 1976, the Division received a total of 30,981 appeals from all its unemployment programs. During the period beginning January 1975 and ending May 31, 1976, there were 21,902 appeals from deputys' determinations by claimants seeking Regular Unemployment Insurance, and 5,448 appeals from claimants seeking benefits under one of the Division's eight other programs. It should be noted that statistics showing the number of claimants who filed appeals after their benefits were terminated were unavailable.
29. From January 1975 through July 1976, there were 22,739 appeals decisions rendered with regard to Regular Unemployment Insurance. Of this total, an average of 18.96 percent were reversed, and, on the average 40.22 percent of the appeals decisions were rendered within less than thirty days of filing, and 70.45 percent were rendered within less than forty-five days of the filing of the appeal.
30. From March 1975 through July 1976, there were 868 appeals decisions rendered concerning claims made under the Extended Benefits Program, one of the other eight programs offered by the Division. Of this total, an average of 19.93 percent were reversed, and, on the average, 28.06 percent of the appeals decisions were rendered within less than thirty days of filing, and 60.68 percent were rendered within less *44 than forty-five days of the filing of the appeal.
31. According to Unemployment Insurance Statistics, published by the United States Department of Labor, Employment Training Administration, of the fifty-two states and territories required to file appeal time lapse figures, Missouri processed the ninth largest number of appeals decisions during the period from January 1975 to December 1975. In that same period of time, seventeen out of the fifty-two states and territories reported processed a larger percentage of appeals within thirty days than did Missouri, but none of those seventeen states was required to render as many appeals decisions as was Missouri.
32. Of the fifty-two states and territories reporting the time lapse between date of filing appeals and date of decisions from January 1975 to December 1975, seventeen processed a higher percentage of appeals decisions within forty-five days than did Missouri. None of those seventeen states was required to process as many appeals decisions as Missouri during that same period of time.
33. Of the fifty-two states and territories reporting to the Department of Labor for the period of January 1975 to December 1975, twenty processed a higher percentage of appeals within seventy-five days. Only one of those twenty states was required to process more appeals decisions within that period of time than was Missouri. With regard to that state, Massachusetts, the statistics include decisions rendered by the Massachusetts director or his representative. The statistics published by the Department of Labor do not indicate that any other state reported decisions rendered by its director or his representative.
34. The federal standard for appeals promptness is set out at 20 C.F.R., sections 650.2, 650.3, and 650.4, which provide in pertinent part as follows:
"§ 650.2 Federal Law requirements.
"(a) Section 303(a)(1) of the Social Security Act requires that a State law include provision for:
"Such methods of administration * * as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due.
"(b) Section 303(a)(3) of the Social Security Act requires that a State law include provision for:
"Opportunity for a fair hearing, before an impartial tribunal for all individuals whose claims for unemployment compensation are denied.
"(c) Section 303(b)(2) of the Social Security Act provides that:
"Whenever the Secretary of Labor, after reasonable notice and opportunity for hearing to the State agency charged with the administration of the State law, finds that in the administration of the law there is 
(1) * * *
(2) A failure to comply substantially with any provision specified in subsection (a)[303(a)]; the Secretary of Labor shall notify such State agency that further payments will not be made to the State until he is satisfied that there is no longer any such denial or failure to comply. Until the Secretary of Labor is so satisfied, he shall make no further certification to the Secretary of the Treasury with respect to such State * * *
"650.3 Secretary's interpretation of Federal law requirements.
"(a) The Secretary interprets sections 303(a)(1) and 303(a)(3) above to require that a State law include provision for 
"(1) Hearing and decision for claimants who are parties to an appeal from a benefit determination to an administrative tribunal with the greatest promptness that is administratively feasible, and
"(2) Such methods of administration of the appeals process as will reasonably assure hearing and decision with the greatest promptness that is administratively feasible.
"(b) The Secretary inteprets [sic] section 303(b)(2) above to require a State to comply substantially with provisions specified in paragraph (a) of this section.

*45 "650.4 Review of State law and criteria for review of State compliance.
"(a) A State law will satisfy the requirements of § 650.3(a) if after calendar year 1973 it contains a provision requiring, or is construed to require, hearing and decision for claimants who are parties to an administrative appeal effecting benefit rights with the greatest promptness that is administratively feasible.
"(b) A State will be deemed to comply substantially with the State law requirements set forth in § 650.3(a) with respect to first level appeals, if for the calendar year 1975 and ensuing years, the State has issued at least 75 percent of all first level benefit appeal decisions within 30 days of the date of appeal, and at least 85 percent of all first level benefit appeal decisions within 45 days. These computations will be derived from the State's regular reports required pursuant to the Employment Security Manual, Part III, Sections 4400-4450.
"(c) To afford the States a reasonable opportunity to make the changes necessary to meet these criteria, the Secretary will not evaluate substantial compliance until calendar year 1974 and for that year he will apply less stringent criteria than for future years. A State law will be deemed to comply substantially with the State law promptness requirement for calendar year 1974 if the State has issued at least 50 percent of all first level benefit appeal decisions within 30 days of the date of appeal; at least 75 percent of its first level benefit appeal decisions within 45 days; and at least 90 percent of its first level benefit appeal decisions within 75 days. These computations also will be derived from the aforementioned reports required pursuant to the Employment Security Manual."
35. Volume 41, No. 31, of the Federal Register, published on February 13, 1976, provides in pertinent part at page 6757, with regard to Title 20, part 650, as follows:
"The requirement of the standard is one of substantial compliance with the promptness criteria stated therein. When a State fails to meet the promptness criteria a determination must be made as to whether the State nonetheless had demonstrated the requisite substantial compliance. Such a determination requires an inquiry into the circumstances that have prevented the State from meeting the specified criteria. If the inquiry demonstrates that the State has achieved the greatest appeals promptness reasonably attainable in its circumstances, the State may be considered to be in substantial compliance."
36. At all times since the filing of the plaintiffs' complaint to date, the State of Missouri has been considered by the Department of Labor to be in compliance with the Federal Regulations. The economic situation of this country during the past two years has had a tremendous and unpredictable affect on the area of unemployment compensation and has resulted in an enormous increase in claims for unemployment benefits and appeals growing out of such claims. Throughout the unexpected increase in unemployment stated above, the State of Missouri has been considered by the Department of Labor to have achieved the greatest appeals promptness reasonably attainable under the circumstances and has consistently been in substantial compliance with that Department's appeals promptness requirements.
37. Plaintiff Mary A. Graves renewed a claim for Special Unemployment Assistance under Title II of the Emergency Jobs and Unemployment Assistance Act of 1974. The effective date of her renewed claim was January 18, 1976. She subsequently filed claims for unemployment benefits for certain weeks thereafter.
Pursuant to section 288.070 of the Missouri Employment Security Law, R.S.Mo. 1969, the Missouri Division of Employment Security mailed a notice of renewed claim for unemployment benefits to the plaintiff's last employer, Reserve Office Force Company, whose name was furnished by the plaintiff when she filed her renewed claim.
The plaintiff's last employer sent to the Division a letter dated February 26, 1976, *46 stating that the plaintiff had refused an offer of work made by the employer on said date.
The plaintiff filed her claim for unemployment benefits for the week ending February 28, 1976, by mailing to the Division her claim card for that week. On this card the plaintiff stated that she had not refused any work during the week. The card was signed by the claimant, and the signature is dated February 28, 1976.
Due to the discrepancy between the information contained in the February 26, 1976, letter from the plaintiff's last employer and the information contained in the plaintiff's claim card for the week ending February 28, 1976, the plaintiff was notified to report to the local office of the Division.
On or about March 4, 1976, the plaintiff reported to the local office of the Division and was interviewed by a deputy regarding her claim for the week ending February 28, 1976. She was also shown the letter from her last employer and given an opportunity to present any information regarding her claim for the week in question.
After receiving the information presented by the plaintiff, and based upon all information available to him, the deputy made his determination regarding the plaintiff's claim for benefits for the week ending February 28, 1976. The determination of the deputy was made and mailed to the plaintiff on March 11, 1976. The deputy determined that the plaintiff was not disqualified for unemployment benefits, because she had good cause for refusing the offer of work made by her last employer. However, the deputy did determine that the plaintiff was ineligible for benefits for the week ending February 28, 1976, because she was restricting her availability for employment by working in a part-time job four and one-half hours per week, and was not available for full-time employment.
As a result of the deputy's determination that the plaintiff was ineligible for unemployment benefits for the week ending February 28, 1976, the plaintiff was not paid such benefits for that week.
On March 17, 1976, the plaintiff filed a timely appeal from the deputy's determination. After due notice to the interested parties, the appeal was heard by an appeals referee of the Division in St. Louis, Missouri, on April 29, 1976.
On May 11, 1976, the appeals referee entered his decision reversing that part of the deputy's determination which found the plaintiff ineligible for unemployment benefits. The appeals referee found that the plaintiff was eligible for such benefits for the week ending February 28, 1976.
Pursuant to the May 11, 1976, decision of the appeals referee, the plaintiff was paid unemployment benefits for the week ending February 28, 1976. The check paying such benefits was issued May 15, 1976.
38. Plaintiff Gary T. Morris filed an initial claim for unemployment insurance benefits, effective August 31, 1975, under the Missouri Employment Security Law, and claimed benefits for each subsequent week through December 13, 1975, at which time he had exhausted his benefits under the regular unemployment insurance program.
The plaintiff then filed an application for benefits under the Extended Benefits Program, effective December 14, 1975, and claimed benefits for each subsequent week through February 7, 1976, at which time he had exhausted his benefits under the Extended Benefits Program.
On February 11, 1976, the plaintiff filed an application for benefits under the Federal Supplemental Benefits Program, effective February 8, 1976. At the time of filing this application under the Federal Supplemental Benefits Program, the plaintiff had been enrolled as a student and attending classes at the University of Missouri at St. Louis, and so informed the deputy. The information provided by the plaintiff on February 11, 1976, regarding his enrollment as a student, raised an issue as to the plaintiff's eligibility for benefits for certain weeks. The plaintiff was given the necessary forms and claim cards for the first two weeks (February 8 through February 21, 1976), and as a result of the issue raised, *47 instructed to report back on February 26, 1976, for an interview.
On April 1, 1976, the deputy made a determination that the plaintiff was ineligible for benefits from August 31, 1975, to January 24, 1976, because during that period the plaintiff was a full-time student and not available for work. The deputy also determined that the ineligibility of the plaintiff resulted in his being overpaid $906.63 on his Regular Unemployment Insurance claim and $453.32 on his claim under the Extended Benefits Program. These determinations were each mailed to the plaintiff.
The plaintiff was otherwise eligible for benefits for certain weeks claimed subsequent to January 24, 1976, but was not paid for those weeks, because the plaintiff's weekly benefit amount was applied to offset his overpayment.
On April 9, 1976, the plaintiff filed a timely appeal from the deputy's determinations. After due notice to the interested parties, the appeal was heard by an appeals referee of the Division in St. Louis, Missouri, on May 19, 1976.
On May 24, 1976, the appeals referee entered his decision affirming the determinations of the deputy.
Plaintiff Morris, thereafter filed a timely application for review to the Labor and Industrial Relations Commission which, as of the date of trial, was pending.
39. Although so empowered by law, it is the policy of the Division not to institute court proceedings to recover benefit overpayments; however, the Division does make efforts short of court action to recover any such moneys.
40. As stipulated by the parties, the legal issue to be resolved in this matter is whether sections 288.070.3 and 288.070.5, R.S.Mo.Supp.1973, and the application of those sections by the defendants, violate Title 42, U.S.C., section 503(a)(1) and (3), and the Fourteenth Amendment of the United States Constitution for failure of same to provide notice and a prior evidentiary hearing before a claimant, who had received benefits for a prior week or weeks claimed, for unemployment benefits, is denied benefits for a particular week or weeks claimed.

Conclusions of Law
Prior to determining the stipulated legal issue, the Court must resolve the threshold issue of whether the constitutional due process requirements of the Fourteenth Amendment to the United States Constitution apply to the state's granting or denying of unemployment benefits. The Supreme Court has made it clear ". . . that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." Board of Regents v. Roth, 408 U.S. 564, 571-72, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). Accordingly, the procedural due process requirements of the Fourteenth Amendment have been held to apply to a wide variety of property interests.[1] Unemployment benefits like welfare benefits, ". . . are a matter of statutory entitlement for persons qualified to receive them," Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970), and, therefore, are interests, like welfare benefits or wages, which are protected by the procedural due process requirements of the Fourteenth Amendment.
Having determined that procedural due process does apply, the Court must now decide what is necessary to satisfy those requirements. More specifically, does the present system which affords claimants a post-termination evidentiary hearing meet *48 the due process requirements, or is a pre-termination evidentiary hearing necessary? The plaintiffs rely principally on Goldberg v. Kelly, supra, in which the Supreme Court held that welfare benefits could not be terminated without first providing the recipient with a pre-termination evidentiary hearing. The defendants' case rests mainly on Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In Mathews, the Court was confronted with arguments based on Goldberg similar to those advanced here by the plaintiffs. While holding that an evidentiary hearing was not necessary prior to the termination of disability benefits under the Social Security Act, the Court stated that:
"Only in Goldberg has the Court held that due process requires an evidentiary hearing prior to a temporary deprivation." Mathews v. Eldridge, 424 U.S. 319, 340, 96 S.Ct. 893, 905, 47 L.Ed.2d 18 (1976).
For the reasons stated below, Mathews is controlling in this matter; therefore, an evidentiary hearing prior to the termination of unemployment benefits in Missouri is not necessary.
In determining whether the administrative procedures provided meet the procedural due process requirements of the Fourteenth Amendment, three distinct factors must be considered:
". . . first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 335, 96 S.Ct. at 903.
While determining the nature of the government function involved and the affected private interests concerning welfare benefits, the Court stated in Goldberg v. Kelly, supra, at 264, 90 S.Ct. at 1018, that:
"Thus the crucial factor in this context  a factor not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended  is that termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate."
Neither the termination of disability benefits in Mathews nor the termination of unemployment benefits in the case at bar would deprive a claimant of the ". . . very means by which to live while he waits" for a post-termination evidentiary hearing. Id. Here, as in the case of disability benefits, there is a
". . . possibility of access to private resources [and], other forms of government assistance will become available where the termination of disability benefits places a worker or his family below the subsistence level." Mathews v. Eldridge, supra, at 342, 96 S.Ct. at 906.
Further, eligibility for welfare benefits is based on financial need, but eligibility for unemployment benefits are not. An individual could have $1,000,000 in a savings account and nonetheless be entitled to unemployment benefits. Additionally, the potential deprivation in this case is likely to be less than that of both welfare and disability recipients. Therefore, the administrative procedures provided by the State of Missouri clearly satisfy the due process requirements of the Fourteenth Amendment with regard to the first factor.
In considering the second factor, we note that the risk of erroneous deprivation of benefits is minimized by the notice and interview procedure which affords the claimant an immediate opportunity to correct an erroneous denial of benefits. This procedure, previously described is fair and reliable. See Mathews v. Eldridge, supra at 343, 96 S.Ct. 893. The record shows that on appeal, where the post-termination evidentiary *49 hearing is held, only 18.96 percent of the cases are reversed. Thus, the risk of erroneous deprivation of unemployment benefits is slight. In Mathews v. Eldridge, supra, at 342, 96 S.Ct. at 906, the Court stated that ". . . the delay between the actual cutoff of benefits and final decision after a hearing exceeds one year", and noted that the hardship thus imposed may be significant, but that it would still be less than that of welfare recipients. In this case, an average of 70.45 percent of the appeals rendered with regard to Regular Unemployment Insurance are rendered within less than forty-five days after the appeals are filed. Therefore, it is clear that not only is the risk of a claimant being erroneously deprived of unemployment benefits slight, but any delay caused by such delay would be minimal and significantly less than that in Mathews. Accordingly, the due process requirements of the Fourteenth Amendment are satisfied by the administrative procedures provided by the State of Missouri with regard to the second factor.
Finally, the Court must consider the Government's interest. While cost alone is not controlling, it is a factor to be considered when determining the constitutional sufficiency of the administrative procedures provided. Mathews v. Eldridge, supra. Should the State of Missouri be required to hold an evidentiary hearing prior to the termination of unemployment benefits, the administrative costs alone would be substantial. Additionally, such a procedure would require that the claimants continue to receive benefits until a decision was rendered in the pre-termination hearing. While statistics are not available to show the percent of claimants whose unemployment benefits are terminated and then file appeals, it is only logical to assume that if the claimants continue to receive benefits pending the pre-termination decision, an increased percentage would request such a review so as to receive the additional benefits. These "over payments" could, as the plaintiffs contend, be offset against the claimant's benefits when next he receives them, but not all persons apply regularly enough to allow the state to recoup these increased costs.
Having illustrated only a few of the more evident circumstances which would give rise to increased costs, it is clear that the additional burden on the State of Missouri would not be insubstantial. The Court stated in Mathews v. Eldridge, supra, at 348, 96 S.Ct. at 909 that:
"At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost."
After having considered the three distinct factors set out in Mathews v. Eldridge, supra, it becomes clear that the "point" has been reached, and that the procedural due process requirements of the Fourteenth Amendment are met by the system now provided by the State of Missouri for the termination of unemployment benefits.
The plaintiffs also contend that by suspending unemployment benefits pending the decisions on appeal, the defendants violate the Social Security Act, 42 U.S.C. § 503(a)(1), which provides in pertinent part:
"(a) The Secretary of Labor shall make no certification for payment to any State unless he finds that the law of such State, approved by the Secretary of Labor under the Federal Unemployment Tax Act, includes provision for 
"(1) Such methods of administration . . . as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due;"
The plaintiffs cite California Human Resources Dept. v. Java, 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971), in support of their position. In Java, California had a procedure whereby an administrative official would determine initial eligibility for unemployment benefits. However, if the claimant's former employer protested, the claimant's benefits were automatically terminated. The Court found that this procedure *50 violated the "when due" clause of 42 U.S.C. § 503(a)(1), and held:
"We conclude that the word `due' in § 303(a)(1), when construed in light of the purposes of the Act, means the time when payments are first administratively allowed as a result of a hearing of which both parties have notice and are permitted to present their respective positions; any other construction would fail to meet the objective of early substitute compensation during unemployment. Paying compensation to an unemployed worker promptly after an initial determination of eligibility accomplishes the congressional purposes of avoiding resort to welfare and stabilizing consumer demands; delaying compensation until months have elapsed defeats these purposes. It seems clear therefore that the California procedure, which suspends payments for a median period of seven weeks pending appeal, after an initial determination of eligibility has been made, is not `reasonably calculated to insure full payment of unemployment compensation when due.'" Id. at 133, 91 S.Ct. at 1355.
Accordingly, the Java decision is clearly limited to situations where after a claimant has been initially determined eligible to receive benefits for a particular period, his benefits for that particular period are then terminated. In this case, the initial determinations are made on a week-to-week basis. Therefore, Java would be applicable in this case if after a claimant is found eligible for a particular week, his benefits for that particular week were terminated. That situation does not exist here; thus, Java is not applicable.
A judgment will be entered in favor of the defendants and against the plaintiffs and the cause will be dismissed with prejudice.
NOTES
[1] See, e. g., Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (social security benefits); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (wages); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare benefits); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (driver's license); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (consumer goods); Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (good name and reputation).