**Anna ROSS et al., Plaintiffs-Appellants,**

v.

**John HORN, Commissioner, Division of Employment Security, Department of Labor and Industry of the State of New Jersey, et al., Defendants-Appellees.**

No. 78–2260.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) March 20, 1979.

Decided May 25, 1979.

Richard S. Semel, Hackensack, N. J., for plaintiffs-appellants.

John J. Degnan, Atty. Gen. of N. J., Trenton, N. J., for defendants-appellees; Stephen Skillman, Asst. Atty. Gen., Trenton, N. J., of counsel, Michael S. Bokar, Chief Deputy Atty. Gen., Trenton, N. J., on the brief.

Before GIBBONS and HIGGINBOTHAM, Circuit Judges, and MARKEY *, Chief Judge, United States Court of Customs and Patent Appeals.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

A tension exists, in the administration of public welfare or benefit programs, between the need to guarantee the fair handling of each individual's claim and the need to efficiently monitor such programs to minimize fraudulent and otherwise improper claims. This case presents the issue of whether the procedures utilized by the New Jersey Department of Labor and Industry to prevent fraud in the receipt of unemployment benefits adequately protect the interests of those claiming entitlement to unemployment compensation funds. We must also decide whether a plaintiff is entitled to counsel fees where procedures have been changed subsequent to the filing of the plaintiff's lawsuit, but when there has been no formal judgment or settlement decree mandating such changes.

More specifically, appellants in this class action [1] contend that the procedures utilized by the Division of Employment Security of

---

* Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, Washington, D.C., sitting by designation.

1. The following class was certified:
   (1) all of those persons whose applications for Unemployment Compensation benefits have been "pended" or have otherwise not been acted upon, because they are suspected of, accused of, or indicted for, but not convicted for receiving unemployment compensation benefits fraudulently, or by means of false representations, and (2) all applicants for unemployment compensation benefits who have been disqualified for the receipt of such benefits until they make full restitution of the alleged overpayments and criminal action instituted by the Division of Employment Security has been completed.
   Order of January 27, 1976, Appellants' Appendix, p. 28.

the New Jersey Department of Labor and Industry in the processing of suspected unemployment fraud ("wage-benefit conflict") cases violate the "fair hearing" and "when due" provisions of 42 U.S.C. Section 503(a) [2] as well as the due process clause of the Fourteenth Amendment.[3] The district court found no such violations and entered judgment for the appellees. Appellants were also denied counsel fees. We affirm the entry of judgment in favor of appellees but remand for a re-determination of the counsel fees issue.

## 1. THE CHALLENGED PROCEDURES

The following background to these proceedings was succinctly set forth by the court below:

New Jersey participates in the jointly-funded federal-state unemployment compensation program established by Title III of the Social Security Act, 42 U.S.C. § 501, et seq. The unemployment compensation law in New Jersey, N.J.Stat. Ann. 43:21–1, et seq., is administered by the Division of Employment Security of the Department of Labor and Industry, represented by the defendant Horn.

\* \* \* \* \* \*

The Bureau of Unemployment and Disability Insurance Programs in the New Jersey Department of Labor and Industry is responsible for developing and implementing programs, procedures, and instructions for the forty-one (41) local unemployment claims offices throughout the State and appraising the quality of the operation of those offices. Various

manuals have been prepared by the Bureau setting forth the procedures to be followed by the local offices, and so-called administrative instructions are issued to the office managers from time to time in order to supplement or update the information in the manuals. Similar directives are issued to the head of the Department's Fraud Inspection Section. Both the local offices and the latter Section are bound by such directives.

To file a claim for unemployment benefits, an individual must report in person to a local office, where an application for benefits is filled out which, among other things, warns him that he is subject to certain penalties for any misrepresentation. The initial application is processed through a computer and a written request for wage and separation information respecting the claimant is mailed to the responsible employer. When he reports back to the local office fourteen (14) to twenty-one (21) days after the filing of the claim, the claimant is given a written determination as to his eligibility for benefits and, if found eligible, is advised of his maximum benefit amount and weekly benefit rate. At that time, the claimant receives his first benefit check upon signing a pay order, which, like the claim application, contains a warning as to the consequences of a misstatement. He continues to report to the local office and receive his benefit checks on a bi-weekly basis. If his eligibility for benefits is called into question, a hearing is held, and if the decision is adverse to the claimant he is entitled to a plenary de novo hear-

---

**2.** The relevant portions of Section 503(a) provide:

(a) The Secretary of Labor shall make no certification for payment to any State unless he finds that the law of such State, approved by the Secretary of Labor under the Federal Unemployment Tax Act, includes provision for—

(1) Such methods of administration (including after January 1, 1940, methods relating to the establishment and maintenance of personnel standards on a merit basis, except that the Secretary of Labor shall exercise no authority with respect to the selection, tenure of office, any compensation of any individual

employed in accordance with such methods) as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due; and

\* \* \* \* \* \*

(3) Opportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied;

\* \* \* \* \* \*

**3.** Appellants had argued below that the challenged procedures violate the double jeopardy clause of the Fifth Amendment. They have not pressed this argument on appeal.

ing before the Appeal Tribunal, with a further right of appeal to the Board of Review and the New Jersey courts. The same right of administrative and judicial review exists in the case of decisions rendered by the Fraud Inspection.

Instances of suspected unemployment fraud, or so-called wage-benefit conflicts, come to the attention of the Department of Labor and Industry by various means. The responsible employer is furnished monthly with a statement showing the benefits paid to the claimant; if the employer, upon matching the statement against its payroll records, finds that the claimant was employed during weeks for which he was paid benefits, this is brought to the attention of the Department. The Department also submits a list of all claimants and their benefit payment records on a quarterly basis to the Social Security Administration, where the information is cross-matched against any payroll data received by the federal agency for the same period; upon being advised of a possible wage-benefit conflict by this means, a Form B–98B, Claimant's Benefit Payment and Employment Record (D–1 in evidence) is forwarded to the employer requesting information on the claimant's employment, if any, during the period in question. Also, information respecting a possible wage-benefit conflict may be supplied the claimant himself, and periodic agency audits of payroll records in industries where there appears to be a high incidence of unemployment fraud.

*Ross v. Horn,* No. 74–818 (D.N.J. May 23, 1978), Appellants' Appendix, pp. 40–42.

At the time the complaint in this action was filed, New Jersey's procedures with respect to those suspected of having wage-benefit conflicts varied according to the seriousness of the suspected violations. In the more serious cases, where criminal prosecution was contemplated, a claimant was sent a notice requesting his appearance at a hearing so that he might show cause why his unemployment benefits should not be suspended. If, after the hearing, a wage-benefit conflict was found, the claimant

was notified that his case would be referred for criminal prosecution and that any future payments owed the claimant would be suspended pending disposition of the criminal case. In less serious cases, a claimant received no hearing, but was sent a Determination and Demand for Refund of Unemployment Benefits. Pursuant to an unwritten policy, applications by persons suspected of wage-benefit conflicts were not acted upon until criminal action was either decided against or completed.

Shortly after this case was filed, new procedures were implemented whereby all claimants suspected of wage-benefit conflicts were given an opportunity to be heard prior to a termination of their benefits. These new procedures have evolved somewhat since their initial implementation. The following are the procedures mandated by the most recent regulations and Administrative Instructions.

Local unemployment insurance claims offices are to schedule hearings "as soon as possible, but no later than 30 days" after they have been notified by the Fraud Inspection Section of the Department of Labor and Industry's Bureau of Payment Control that a wage-benefit conflict may exist. Appellants' Appendix, p. 87. Notice is then sent to the claimant informing him that evidence has been received that he was employed for a specified period during which he received unemployment benefits, that he may be subject, as a result, to specified consequences, and requesting that he report for a fact-finding interview at a given time and date. The notice informs the claimant that he has "the right to representation and witnesses," that he should bring any evidence he has to support his claim, and that the local office must be notified if he cannot attend the interview. In the less serious or "non-criminal" cases, the interview is conducted by a claims examiner in the local office. In the more serious cases, the interview is conducted by investigators in the Fraud Inspection Section. In both cases, the claimant is told that information has been received indicating that he received benefits for periods

during which he was employed and is shown a form which reveals the basis for the allegations. The claimant is given an opportunity to rebut the allegations. The examiner prepares a summary of the claimant's statements which the claimant is asked to sign. In the more serious cases, claimants are advised of their privilege against self-incrimination and their right to representation by counsel.

The relevant information is then sent to the Inspection Section along with a suggestion as to whether further investigation is warranted. That Section then makes a determination as to whether there was in fact a wage-benefit conflict. If a wage-benefit conflict is found, a form entitled "Determination and Demand for Refund of Unemployment Benefits and Imposition of Penalty and Disqualification Because of Conflicting Wages" is sent to the claimant. This Determination and Demand informs the claimant that, under New Jersey's Unemployment Compensation Law, he is disqualified for benefits for a 17-week period and that the maximum amount of benefits the claimant can receive is reduced by 17 times the weekly amount of improper benefits received. The claimant is requested to repay the improperly received benefits and to pay a statutorily imposed fine. The claimant is also informed that he has a right of appeal which must be exercised within a week. If an appeal is filed, the claimant is entitled to a plenary *de novo* evidentiary hearing and can appeal from there to a Board of Review and then to the Appellate Division of the New Jersey Superior Court.

According to the court below, claimants whose applications had been "pended" or not acted upon pursuant to the old procedures and who had not received a hearing were given an opportunity to be heard in accordance with the new procedures just described. Named plaintiffs Ross and Norkett have received interviews and determinations and have pursued their claims in state proceedings. The status of named plaintiff Thomas is less clear. At trial, the testimony of state officials indicated that his application for benefits had not been acted upon pending the resolution of a

criminal investigation against him arising out of alleged wage-benefit conflicts. The failure to act on this application apparently was the result of confusion among the state unemployment officials as to the application of the new procedures to old cases. The testimony also indicated that action will now be taken on these old cases according to the new procedures, although it is not clear that a firm policy has emerged. Testimony of Kristjen, T–80; Testimony of Graziano, T–121. In affirming the judgment here we assume, on the basis of this testimony, as the district court apparently did, that the new procedures will be applied to all those whose current applications have not been acted upon because of alleged prior wage-benefit conflicts.

## 2. CHALLENGES TO THE PRESENT PROCEDURES

Appellants argue that the procedures currently employed are defective in a number of respects. They argue that due process standards are not met in that:

1. The claimant cannot confront witnesses at the pre-determination interview.

2. The pre-determination interview is not always conducted by impartial decisionmakers.

3. The decisions ultimately rendered via the Determination and Demand form are inadequate because no evidentiary support or reasons for the decision are given.

4. The notice of the pre-determination interview sent to claimants is inadequate.

5. The regulations do not contain adequate provision for the service of the notice.

6. The hearing examiners are not adequately trained or given adequate guidelines for conducting the interviews.

■ We begin our analysis by noting that appellants certainly have a property right in receiving unemployment benefits to which they are entitled by statute. *See, e.*

g., *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Thus it is clear that they may not be deprived of this right without due process.

We are therefore confronted with the question of what the elusive concept of "due process" demands in these circumstances.[4] Appellants' contentions are largely premised on the notion that they are entitled to a full pre-determination evidentiary hearing. We reject this premise.

### a. Entitlement to Pre-determination Evidentiary Hearing

■ In *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903, the Supreme Court set forth the following three factors to be considered in determining what due process requires in a specific circumstance:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

The Court there analyzed those three factors and determined that H.E.W.'s procedures for terminating disability benefits were adequate. Those procedures provided for a pre-determination interview, but no full pre-determination evidentiary hearing.

This court faced a similar issue in *Mattern v. Mathews*, 582 F.2d 248 (3d Cir. 1978), *petition for cert. filed*, 47 U.S.L.W. 3446 (January 2, 1979), where H.E.W.'s procedures for recoupment of alleged overpayments under Section 204 of the Social Security Act, 42 U.S.C. § 404, were scrutinized.[5]

We held that pre-recoupment hearings were not generally required, but that, where the claimant opposed recoupment on the basis of Section 204(b), 42 U.S.C. § 404(b), which precludes recoupment where the beneficiary is without fault and the recoupment would defeat the purpose of Title II of the Act or would be "against equity and good conscience," an informal hearing with certain prescribed minimum safeguards must be provided prior to recoupment.

In considering the situation here in light of the three factors identified in *Mathews v. Eldridge*, it is helpful to refer to the application of those factors in *Eldridge* and in *Mattern*, and to *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969), the seminal case applying procedural due process guarantees to the modern welfare system.

The first factor to be considered is the private interest that will be affected by the official action. In *Goldberg*, where the termination of benefits under the Aid to Families with Dependent Children (AFDC) program through New York State's Home Relief program was involved, the Court emphasized that "termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate." 397 U.S. at 264, 90 S.Ct. at 1018. In *Eldridge*, it was noted that, since eligibility for disability benefits is not based upon financial need and other government benefits may be available if disability benefits are terminated, "[t]he potential deprivation here is generally likely to be less than in *Goldberg*, although the degree of difference can be overstated." 424 U.S. at 341, 96 S.Ct. at 906.[6] The court in *Mattern* deter-

---

**4.** We assume here that the requirements of due process and those of the "fair hearing" provision of 42 U.S.C. § 503(a) are co-extensive. Therefore, we will not analyze separately these statutory and constitutional standards.

**5.** An essentially identical issue was raised and result reached in *Elliot v. Weinberger*, 564 F.2d

1219 (9th Cir. 1977), *cert. granted*, 439 U.S. 816, 99 S.Ct. 75, 58 L.Ed.2d 106 (1978).

**6.** The Court in *Eldridge* also analyzed in this regard the length of time ordinarily required before improperly denied benefits were reinstated. The record here does not provide meaningful evidence on this point.

mined that the effect on private interests was greater than that in *Eldridge* because the amount of benefits received was generally affected by need and that need was a particularly important factor in 204(b) determinations. The effect was found to be less than that in *Goldberg*, however, because "[t]he victims of erroneous recoupment, like the claimant in *Eldridge*, generally have resort to welfare and other benefits." 582 F.2d at 255. The private interest here most closely approximates that in *Eldridge* especially since unemployment compensation benefits are not necessarily need-based.

Next to be considered is the risk of an erroneous deprivation of the claimant's interest through the procedures currently used and the probable value of additional or substitute safeguards. In analyzing this factor, primary attention has been focused on the type of determination that must be made and the type of evidence necessary to make that determination. In *Eldridge*, the court concluded that since disability determinations are largely based upon medical reports by physician specialists there is little need to inquire into credibility and therefore decisions can be adequately made on the basis of documentary submissions. The *Eldridge* court contrasted the circumstances there with those in *Goldberg* where credibility was an important factor and where the claimants could not be expected to communicate effectively through written submissions. In *Mattern*, the recoupment decisions generally involved arithmetic computations and therefore document-based decisions were considered adequate. Where a 204(b) claim was made, however, and therefore issues of "fault, financial dependence, and detrimental reliance" were involved, the resolution of credibility questions looms large and therefore evidence is not "well suited to evaluation in written form . . ." 582 F.2d at 256.

Again, the situation here is closest to that in *Eldridge.* As described in the portion of the district court opinion quoted above, wage-benefit conflicts are generally brought to light as a result of the comparison of benefit payment records with payroll data received from Social Security Administrators or with employers' payroll records. Thus the proof of wage-benefit conflicts is largely in documentary form. Of course, evidence may come from other sources and credibility determinations may be involved where claimants deny that they were employed to the extent indicated by the Social Security Administration's or the employer's records. As the Court stated in *Eldridge*, however, "To be sure, credibility and veracity may be a factor in the ultimate disability assessment in some cases. But procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." 424 U.S. at 344, 96 S.Ct. at 907.

This case is also similar to *Eldridge* in that there are existing procedures whereby the claimant is told of the information upon which adverse action may be based and is given an opportunity to respond to that information. In *Eldridge*, claimants had full access to all information relied upon by the state agency and claimants were informed in writing of the state agency's tentative assessment prior to the determination of benefits, and were given a summary of the reasons and evidence supporting that assessment. The claimant was then given the opportunity through written submission to rebut this evidence or present additional evidence. Here, claimants received an *oral and written* summary of the information upon which a conflict was suspected and given the opportunity to submit documentary evidence, orally rebut the claim of conflict and present live testimony. Although complete access to agency files is apparently not permitted, the oral explanation and opportunity for oral rebuttal make the procedures here probably better calculated to protect claimants' rights than those in *Eldridge*. In *Mattern*, no oral hearing prior to recoupment was provided. After claimants received notice of the proposed recoupment and the reasons therefor, they had thirty days to ask for reconsideration of

a "waiver" under Section 204(b). In *Graves v. Meystrik*, 425 F.Supp. 40 (E.D.Mo.) (3 judge court), *aff'd without opinion*, 431 U.S. 910, 97 S.Ct. 2164, 53 L.Ed.2d 220 (1977), Missouri's unemployment insurance program procedures under which eligibility was determined on a week-by-week basis were upheld. The three-judge court emphasized that "the risk·of erroneous deprivation of benefits is minimized by the notice and interview procedure [similar to that used here] which affords the claimant an immediate opportunity to correct an erroneous denial of benefits." 425 F.Supp. at 48.[7]

The last factor listed for consideration in *Eldridge* is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335, 96 S.Ct. at 903. The Court in *Eldridge* referred to the "incremental cost resulting from the increased number of hearings and the expense of providing benefits to ineligible recipients pending decision." *Id.* at 347, 96 S.Ct. at 909. Although no specific calculation of the increased cost was made, the Court concluded that "the ultimate additional cost in terms of money and administrative burden would not be insubstantial." *Id.* In *Mattern*, we concluded that the government's interest was somewhat less substantial than that in *Eldridge* since, in *Eldridge*, the government "faced a substantial risk of paying benefits to an ineligible recipient without hope of recovering these funds. In contrast, the hearing we are considering is to determine whether the Secretary will be permitted to recoup an overpayment by deducting the amount from a continuing stream of benefits being paid to a concededly eligible recipient." 582 F.2d at 257. In the wage-benefit conflict context, there will generally not be a "continuing stream of benefits" flowing to "a

concededly eligible recipient" from which any overpayments may. be recovered.

Thus, an analysis of the three factors set forth in *Eldridge* reveals that the salient features of the procedures here most resemble those of *Eldridge* and the non-204(b) cases in *Mattern*. Most significantly, the suitability of wage-benefit conflict claims to resolution by. documentary evidence, coupled with the opportunity for oral or written rebuttal of ·this evidence prior to the initial determination as to the existence of this conflict, convinces us that a pre-determination full evidentiary hearing is not required in this context. We repeat that such a full *de novo* evidentiary hearing is available, as of right, after the initial determination is made.

### b. *Other Due Process Challenges*

■ Having concluded that plenary pre-determination hearings are not required, we also conclude that the pre-determination interview process is not rendered defective as a result of the state's refusal to allow claimants to confront witnesses against them at the interview or as a result of the state's sometimes using an interviewer who had previously participated in the investigation of the alleged conflict. We note that New Jersey's practice is that the interviewer not have prior involvement in the claimant's case. The rights to an impartial decision-maker and to confront witnesses are generally recognized where a plenary hearing is required. Since a plenary hearing is not required at the pre-determination stage and since these rights are conferred at a subsequent plenary hearing, the absence of those safeguards at the interview is not a violation of due process. Similarly, although the form in which a claimant is notified of the determination with respect to an alleged work-benefit conflict does not contain the type of statement of reasons generally re-

---

7. We recognize that the Supreme Court's summary affirmance of *Graves* does not indicate that the Court has adopted the language or reasoning of the lower court. *See Fusari v.*

*Steinberg*, 419 U.S. 379, 391–921, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975) (Burger, C. J., concurring).

quired for decisions after a plenary hearing, we hold that the form is adequate in the context of the procedures utilized here. We base this conclusion on the fact that the form does give a specific statement of the dates of the purported conflicts, the amounts of overpayment, the consequences of the conflict with respect to the fines, recoupment and diminishment of future benefits, and the means by which the determination may be challenged. Also, a more complete statement of reasons is given should the claimant exercise his right to the plenary post-determination hearing.

■ Appellants contend that the initial notice of inquiry into the alleged conflict is inadequate in numerous respects especially in that no statement of consequences of the alleged conflict or of the factual basis for the allegations is given. The form of notice now in use informs claimants that they may be subject, specified under New Jersey statutes, to refund, disqualification, fines and/or prosecution. The factual basis for the allegations is revealed at the interview. Appellants also argue that the service of this notice is inadequate in that the claimant is presumed to have received the notice which is sent by regular mail unless the notice is returned by the post office. We conclude that neither the initial notice, nor the procedures for serving that notice run afoul of statutory or constitutional standards. Finally, we conclude that appellants have not established that the interview guidelines or the training of the interviewers is so inadequate as to constitute a violation of due process. Therefore we hold that the procedures challenged here are in accordance with the mandates of "due process" and the statutory requirement of a "fair hearing."

#### c. The "When Due" Requirement

■ We hold also that the procedures here do not violate 42 U.S.C. § 503(a)(1) which requires that a state's method of administration be "reasonably calculated to insure full payment of unemployment compensation when due."[8] "The basic thrust of the statutory 'when due' requirement is timeliness." *Fusari v. Steinberg*, 419 U.S. 379, 388, 95 S.Ct. 533, 539, 42 L.Ed.2d 521 (1975) (footnote omitted). Appellants have not argued that the appeal process here involves an undue length of time. They argue instead that the "when due" requirement, as construed in *California Department of Human Resources Development v. Java*, 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971), mandates procedural protections not provided here.

In *Java*, the Court held that California's unemployment compensation program violated the "when due" provision in that the benefits of a claimant determined to be eligible were automatically suspended when an employer appealed that determination. Here no automatic suspension of benefits is involved. Instead, the determination of a wage-benefit conflict and the consequences of such a determination occur only after the procedures already described have been followed. We conclude that the procedures here have not been shown to be less than reasonably calculated to insure compensation "when due" and that, therefore, the "when due" provision of § 503 does not require the use of additional procedural safeguards.

#### 3. ATTORNEY'S FEES

■ 42 U.S.C.A. Section 1988 (Supp. Pamph. 1977) provides that in an action under 42 U.S.C. Section 1983 and certain other provisions, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." After a hearing, the court below denied appellants attorney's fees. Appellants argue that they are prevailing parties despite the fact that judgment was entered against them because the changes in New Jersey's wage-

---

**8.** For the complete text of this provision, see note 2, *supra.*

benefit conflict procedures first issued in 1974 were a direct result of this lawsuit. Appellees recognize that attorney's fees may be awarded to a party even though no judgment has been entered in that party's favor. *See, Gagne v. Maher*, 594 F.2d 336 (2d Cir. 1979); *Nadeau v. Helgemoe*, 581 F.2d 275 (1st Cir. 1978); *Brown v. Culpepper*, 559 F.2d 274 (5th Cir. 1977). Appellees contend, however, that the record here does not establish that this lawsuit was a primary cause of the changes here. They also assert that, because judgment was actually entered against the appellants, they cannot be considered prevailing parties.

Addressing the second argument first, we refuse to give conclusive weight to the form of the judgment. In assessing who is a prevailing party, we look to the substance of the litigation's outcome. If the new procedures, which provided much of the relief appellants had initially sought, were implemented as a result of this lawsuit, the appellants were prevailing parties with respect to a portion of their claims (which claims were thereby effectively mooted) irrespective of the judgment entered against them on the balance of their claims.[9]

■ This brings us back to the appellees' first argument that there is no record basis for concluding that the new procedures were, in fact, implemented as a result of this litigation. At the hearing held below on the attorney's fees issue, no evidence was presented on the causal relationship between the suit and the implementation of the new procedures, although the district judge recognized that this litigation was "at least . . . a contributing factor" in the bringing about of these procedural changes. In a situation such as this where the chronology of events strongly suggests such a causal relationship, we hold that a district court must conduct an inquiry to determine whether the lawsuit was the cat-

alyst for the implementation of all or any of the reform measures. This task is complicated by the numerous modifications made by New Jersey during the course of this litigation.

■ Appellants are only entitled to attorney's fees for the time spent on the claims on which they have "essentially succeeded." *See Hughes v. Repko*, 578 F.2d 483, 487 (3d Cir. 1978). Of course, the district court has some discretion to refuse attorney's fees even to prevailing parties. This, however, should not be done unless there are "special circumstances." *See Skehan v. Board of Trustees of Bloomsburg State College*, 590 F.2d 470 (3d Cir. 1978). Some courts have held that fees can only be obtained where the plaintiff's claims were "substantial" or not "frivolous." *See Gagne v. Maher, supra; Nadeau v. Helgemoe, supra*. Since appellants' claims certainly pass any such test, it is unnecessary to define exactly what, if any, threshold standard must be met.

## 4. CONCLUSION

We will therefore affirm the entry of judgment against the appellants, but will remand to the district court for further inquiry, in accordance with this opinion, into whether attorney's fees should be awarded and, if so, in what amount.

---

**9.** *But see Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 273 (10th Cir. 1975) (even if named plaintiff could show that this suit was a catalyst for the defendant employer's change in employment policies, he would not be entitled to attorney's fees under 42 U.S.C. § 2000e–5(k) because he did not prevail on any of his individual or class claims).