## INSTITUTIONALIZED JUVENILES, et al.

v.

## SECRETARY OF PUBLIC WELFARE, et al.

Civ. A. No. 72–2272.

United States District Court, E.D. Pennsylvania.

July 26, 1983.

David Ferleger, Herbert B. Newberg, Philadelphia, Pa., for plaintiffs.

Norman J. Watkins, Deputy Atty. Gen., Harrisburg, Pa., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Before me is the plaintiffs' petition for attorneys' fees and costs. The petition seeks an award of fees pursuant to the Civil Rights Attorneys' Fees Award Act (Fees Act), 42 U.S.C. § 1988. The defendants dispute whether the plaintiffs are prevailing parties within the meaning of the Fees Act. In addition, the defendants challenge the amount of fees sought by David Ferleger, counsel for the plaintiff class, and Herbert B. Newberg, who prepared the fee petition. For the reasons stated below, I conclude that the plaintiffs have prevailed in part within the meaning of the Fees Act. Therefore, Mr. Ferleger and Mr. Newberger are entitled to recover fees. However, I have reduced the amount of fees to be awarded.

### I. Plaintiffs As Prevailing Parties

#### A. *History of the Case*

This action was filed in 1972 "on behalf of the named plaintiffs and all persons eighteen years of age or younger who have been, are, or may be admitted or committed to mental health facilities in Pennsylvania

under the Pennsylvania Mental Health and Mental Retardation Act" of 1966 (1966 Act), 50 Pa.Stat.Ann. §§ 4402 & 4403. *Bartley v. Kremens,* 402 F.Supp. 1039 (E.D.Pa.1975). Named as defendants when the suit was first instituted were the Pennsylvania Secretary of Public Welfare (Secretary) and the directors of three state owned and operated facilities. Subsequently we[1] certified a defendant class that consisted of "directors of all mental health and mental retardation facilities in Pennsylvania which are subject to regulation by the defendant Secretary of Public Welfare." This class, however, was added to the original defendants solely to ensure compliance with any decision regarding the validity of the statute and regulations which the class was bound to implement.

The plaintiffs challenged the law of Pennsylvania relating to "voluntary" admissions and commitments of juveniles to mental health and mental retardation facilities. The language of the 1966 Act permits parents or persons standing *in loco parentis* to "voluntarily" admit or commit a juvenile to such a facility. The 1966 Act requires only that the director of the facility cause an examination to be made. If, as a result of that examination, it is determined that the juvenile is in need of care or observation, the juvenile may be admitted or committed.

After the plaintiffs' suit was initiated, the Secretary promulgated regulations implementing the 1966 Act. These regulations became effective on September 1, 1973. 3 Pa. Bull 1840 (1973) (1973 Regulations). The regulations give some procedural rights to all juveniles and additional rights to juveniles ages thirteen and over. The regulations permit admission or commitment of a juvenile only upon referral by either a pediatrician, general physician, or psychologist. They also require an independent examination by the Director of the Institution or his delegate. Under the 1973 Regulations, juveniles 13 and older are given notification of their rights, the telephone number of counsel, and the right to institute an involuntary commitment proceeding in court within two business days. The plaintiffs contended that the procedures contained in the 1966 Act and 1973 Regulations are inadequate. They argued that due process requires a pre-commitment adversary hearing as well as other rights. Accordingly, they contended that sections 4402 and 4403 of the 1966 Act and the 1973 Regulations are unconstitutional.

After extensive discovery, we permitted the case to be maintained as a class action. *See Bartley v. Kremens,* No. 72–2272 (E.D.Pa. April 29, 1974). A three-day trial was held on September 9, 11, and October 7, 1974. Three expert psychiatrists testified for the plaintiffs and three for the defendants. Extensive facts were placed in the record by stipulation.

On July 24, 1975, the court with one judge dissenting issued its opinion awarding the plaintiffs some but not all of the relief they sought. *See* 402 F.Supp. at 1053–54 (summarizing relief sought by plaintiffs). In particular, we denied the plaintiffs' request for a precommitment hearing. We concluded that due process was satisfied if a child received a probable cause hearing within 72 hours after commitment. This hearing was to be followed by a post-commitment hearing before an unbiased tribunal on the need for commitment. We further stated that due process required that a child receive written notice including the date, time, and place of the hearing and a statement of the grounds for the proposed commitment. We also held that a child had a right to be present at the hearing, to be represented by counsel, and if indigent, to have counsel appointed free of charge. Fi-

---

**1.** This case was originally assigned to Judge Thomas A. Masterson. Upon his resignation, it was transferred to me. Until July, 1980, the case was heard before a three-judge court consisting of the Honorable John J. Gibbons, Circuit Judge, The Honorable Raymond J. Broderick, District Judge and myself. When this action was filed, section 2281 of the Judicial Code provided that an application for an injunction against the enforcement of a state statute on grounds of unconstitutionality was to be heard by a three-judge district court. 28 U.S.C. § 2281 (1970). This provision was repealed on August 12, 1976.

nally, we held that the plaintiffs were entitled to confront and cross-examine the witnesses against them, to offer evidence in their own behalf, and not to be confined except upon a finding by clear and convincing proof that they were in need of institutionalization. Accordingly, we declared sections 4402 and 4403 of the 1966 Act to be unconstitutional on their face and as applied to all members of the plaintiff class.

The defendants appealed our decision. On March 22, 1976, the Supreme Court of the United States noted probable jurisdiction. *Kremens v. Bartley,* 424 U.S. 964, 96 S.Ct. 1457, 47 L.Ed.2d 731 (1976). The case was heard by the Court on December 1, 1977. On July 9, 1976, after the decision of the three-judge court, but before the case was heard by the Supreme Court, Pennsylvania enacted the Mental Health Procedures Act of 1976 (1976 Act). 50 Pa.Stat. Ann. § 7101 et seq. The 1976 Act replaces the 1966 Act so far as mentally ill juveniles are concerned. The 1966 Act continues to apply to mentally retarded juveniles. Passage of the 1976 Act provided those plaintiffs 14 years of age or older, who purportedly were mentally ill, with all the relief they sought in this action. The Act, in essence, treats juveniles 14 years of age and older as adults. As a result their parents may not voluntarily commit them and if the juveniles voluntarily commit themselves, they may withdraw at any time by giving written notice. *Kremens v. Bartley,* 431 U.S. 119, 129, 97 S.Ct. 1709, 1715, 52 L.Ed.2d 184 (1976). Based upon the 1976 Act, the Supreme Court concluded that the claims of the named plaintiffs were moot. The case was remanded for substitution of new plaintiffs and reconsideration of the class definition.

Again significant work was required of plaintiffs' counsel to prepare the case. On remand, on behalf of allegedly mentally retarded members of the class, the plaintiffs again challenged the constitutionality of the 1966 Act and the 1973 Regulations. On behalf of allegedly mentally ill members of the class, the plaintiffs challenged the 1976 Act but only with respect to its treatment of juveniles under the age of 14. In

March of 1978, supplemental evidence was received. The three-judge court issued its second decision on May 25, 1978, again with one judge dissenting. *See Institutionalized Juveniles v. Secretary of Public Welfare,* 459 F.Supp. 30 (E.D.Pa.1978). We adhered to our earlier decision regarding the procedures and rights to which we concluded juveniles were entitled under the due process clause. We declared the 1966 Act, the 1973 Regulations, and the 1976 Act unconstitutional in that they failed to provide mentally ill juveniles under the age of fourteen and mentally retarded juveniles under the age of eighteen with all the rights to which we previously had found them to be entitled.

The defendants again appealed our decision to the Supreme Court. The second argument before the Supreme Court was held on October 10, 1978. Prior to the Supreme Court's decision in *Institutionalized Juveniles,* the Secretary promulgated new regulations implementing the 1976 Act. 8 Pa.Bull. 2432 (1978) (1978 Regulations). The 1978 Regulations provide that each child shall be reexamined and his or her treatment plan reviewed not less than once every 30 days. The regulations also permit a child to object to the treatment plan and thereby obtain a review by a mental health professional independent of the treatment team. The findings of this person are reported directly to the director of the hospital who has the power and the obligation to release any child who no longer needs institutionalization. 8 Pa.Bull. 2436 (1978).

The case was consolidated for hearing before the Court with *Parham v. J.R.* On June 20, 1979, the Court issued opinions in both cases. *See Secretary of Public Welfare v. Institutionalized Juveniles,* 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979); *Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). In the *Parham* case, the Court dealt with a general statute which necessitated a general discussion of the requirements of due process. In *Institutionalized Juveniles,* on the other hand, the Court recognized that it was dealing with a statutory and regulatory system

which had very specific provisions. The Court carefully reviewed the 1976 Act as implemented by the 1978 Regulations and 1966 Act as implemented by the 1973 Regulations. The Court concluded that Pennsylvania law *as it stood at the time of its decision* fully complied with due process. 442 U.S. at 649, 99 S.Ct. at 2527. The Court specifically held that "[t]his program meets the criteria of our holding in *Parham.*" *Id.* at 650, 99 S.Ct. at 2528. The case was reversed and remanded for proceedings not inconsistent with the Court's opinion.

Following remand from the Supreme Court, the plaintiffs moved for the appointment of a special master to investigate the validity of the individual commitments. The plaintiffs also desired to amend their complaint to challenge post-admission procedures. We concluded that it was not appropriate to continue the action as a class action. We also concluded that an appointment of a master was not appropriate. Finally, we held that since the Supreme Court had resolved the plaintiffs' constitutional claims, there was no longer any reason to bring the case before a three-judge court. Accordingly, the three-judge court was dissolved. The action was remanded to me for all remaining proceedings. Judgment was entered in favor of the defendants and against the plaintiffs. *Institutionalized Juveniles v. Secretary of Public Welfare,* 87 F.R.D. 463 (E.D.Pa.1980).

### B. *Plaintiffs Essentially Succeeded*

 Despite the fact that judgment was entered in favor of the defendants, the plaintiffs are not automatically precluded from an award of attorneys fees. *See N.A. A.C.P. v. Wilmington Medical Center,* 689 F.2d 1161, 1166 (3d Cir.1982). The form of the judgment does not determine who is a prevailing party for purposes of the Fees Act. The standard for determining if a plaintiff is a prevailing party is whether the plaintiff "achieved 'some of the benefit sought'" in bringing the suit. *Id.* at 1167 (quoting *Bagby v. Beal,* 606 F.2d 411, 415 (3d Cir.1979)).

In *Ross v. Horn,* the Third Circuit decided the question "whether a plaintiff is entitled to counsel fees where procedures have been changed subsequent to the filing of the plaintiff's lawsuit, but when there has been no formal judgment or settlement decree mandating such changes." *Ross v. Horn,* 598 F.2d 1312, 1314 (3d Cir.1979), *cert. denied,* 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980). In *Ross,* a judgment had been entered in favor of the defendants, however, the court of appeals refused to give "conclusive weight to the form of the judgment." *Id.* at 1322. The court looked instead to the "substance of the litigation's outcome." *Id.* It held

> If the new procedures, which provided much of the relief appellants had initially sought, were implemented as a result of this lawsuit, the appellants were prevailing parties with respect to a portion of their claims (which claims were thereby effectively mooted) irrespective of the judgment entered against them on the balance of their claims.

*Id.*

The court also stated that "[i]n a situation ... where the chronology of events strongly suggests such a causal relationship, we hold that a district court must conduct an inquiry to determine whether the lawsuit was the catalyst for the implementation of all or any of the reform measures." *Id.* In remanding the case to the district court for an evidentiary hearing, the court cautioned that the plaintiffs were only entitled to attorney's fees for the time spent on the claims on which they have "essentially succeeded." *Id.,* (citing *Hughes v. Repko,* 578 F.2d 483, 487 (3d Cir.1978)).

The *Ross* case recognized two criteria for an award of attorney's fees where the plaintiff is not the formal judgment-winner. First, the change in the status quo must result in plaintiffs receiving some of the benefit they sought so that it can be said that the plaintiffs "essentially succeeded" on the merits. Second, the circumstances by which the plaintiffs obtain the benefit they sought must be causally linked to the prosecution of the litigation. Both

criteria have received more detailed examination in other cases.

The case of *Hughes v. Repko* introduced the "essentially succeeded" standard for attorney's fee petitions in this Circuit. *Hughes v. Repko,* 578 F.2d 483 (3d Cir. 1978). In order to determine whether the petitioning party is a prevailing party, the *Hughes* court directed the district court to analyze the results obtained. The court held that

> a prevailing party on a particular claim is one who fairly can be found by the district court to have essentially succeeded on such claim, as "claim" is used in Fed.R. Civ.P. 10(b). We say "essentially succeeded" because in many cases a party may prevail on his basic claim but not on all aspects thereof.

*Id.* at 487.

For reasons which follow, I find that the plaintiffs have essentially succeeded as a matter of fact. When plaintiffs began this lawsuit in 1972 their rights were limited to the provisions of the 1966 Act. When in 1979 the Supreme Court held that Pennsylvania law fully protected plaintiffs' due process rights, the Court relied upon not only the 1966 Act, but also, the 1973 Regulations, the 1976 Act and the 1978 Regulations. The latter three provide the plaintiffs with significant procedural rights not encompassed in the 1966 Act and unrecognized in 1972.

Under the 1973 Regulations, mentally retarded children can no longer be admitted solely on the application of a parent. A child must be referred to the treatment facility by a physician following a medical or psychological evaluation. The director of the facility must conduct an independent examination and if he disagrees with the referring physician, must discharge the child. Following admission, the allegedly mentally retarded child or anyone acting on his behalf can challenge the commitment.

The 1976 Act and the 1978 Regulations also provide plaintiffs with the type of procedural safeguards that they sought. With respect to one segment of the class, mentally ill juveniles 14 and older, the relief provided by the 1976 Act is so complete that it mooted their claims in this action. With respect to children under the age of 14, the 1976 Act and the 1978 Regulations provide procedural safeguards such as examination by a treatment team within 72 hours of admission to determine if institutionalization is necessary, review of the child's treatment plan every 30 days, the right to object and obtain review by a professional independent of the treatment team, and if the independent professional finds that the child does not need institutionalization, these findings are reported to the director who has the ability and obligation to release any child not requiring institutionalization.

Thus, it is apparent that the regulations and the 1976 Act did provide plaintiffs with procedural safeguards of which the plaintiffs did not have the benefit when they commenced this litigation. The regulations and the 1976 Act did not provide the plaintiffs with the panoply of due process protections which plaintiffs had sought but they did give plaintiffs procedural rights of the type they sought, *i.e.,* rights which temper a parent's ability to "volunteer" a child for institutionalization. This is sufficient to make the plaintiffs prevailing parties because, as our court of appeals has noted, "[t]he issue is not whether plaintiffs obtained the form or extent of relief they originally requested, but whether the 'substance of the litigation's outcome . . . provided much of the relief appellants had initially sought.'" *N.A.A.C.P. v. Wilmington Medical Center,* 689 F.2d 1161, 1169 (3d Cir.1982) (quoting *Ross v. Horn,* 598 F.2d 1312, 1322 (3d Cir.1979), *cert. denied,* 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980)).

■ In addition to the relief obtained through the legislation and regulations, plaintiffs also contend that the Supreme Court's opinion in *Institutionalized Juveniles* itself provided them with some of the relief they sought. They contend that they won from the Supreme Court a decision which held that juveniles have due process rights independent of their parents. I reject this contention.

To the extent that the Supreme Court did recognize that a juvenile facing institutionalization has due process rights which cannot be waived by the juvenile's parents, it did so by approving the statute and regulations already in force. The statute and regulations had already put these rights into practice. Where intervening statutory and regulatory changes confer upon plaintiffs all relief to which they are entitled, plaintiffs are not entitled to an award of attorneys' fees for time expended obtaining a judicial declaration of their entitlement to the benefits of the statute and regulations.

The plaintiffs apparently recognize that they are not entitled to compensation for time expended obtaining a gratuitous judicial endorsement of legislative and administrative action. Instead, plaintiffs argue that additional rights were won before the Supreme Court which were not part of Pennsylvania law at the time the Court decided *Institutionalized Juveniles*. The plaintiffs contend that *Parham*, the companion case to *Institutionalized Juveniles*, requires additional procedural safeguards. Plaintiffs point to pending regulations proposed by the Secretary in 1979 after the Supreme Court's opinion, and contend that these are necessary to implement the additional rights which plaintiffs won before the Supreme Court. *See* 9 Pa.Bull. 3997 (1979). This argument is at odds with the Supreme Court's opinion in *Institutionalized Juveniles*. The Court's unmistakable holding is that Pennsylvania law as it existed at the time of the Court's decision met the standards established in *Parham*. *See* 442 U.S. at 650, 99 S.Ct. at 2528. The plaintiffs obtained some of the relief that they sought and can be said to have "essentially succeeded" on the merits based upon statutory and regulatory changes, but not based upon any judicial pronouncement.

■ To satisfy the "essentially succeeded" standard the plaintiffs must establish not only that as a matter of fact they received all or some of the relief they sought, but also that they have succeeded in a legal sense. In other words, the defendants must not have acted gratuitously. If the court determines that the defendant's conduct, however beneficial it is to the plaintiffs and however it may resemble the relief sought by plaintiffs' suit, is not required by law, then defendants have acted gratuitously and plaintiffs have not prevailed in a legal sense. *See Nadeau v. Helgemoe*, 581 F.2d 275, 281 (1st Cir.1978). One court suggested that this requirement is satisfied if the plaintiffs' complaint would have survived a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Mental Patient Civil Liberties Project v. Hospital Staff Civil Rights Committee*, 444 F.Supp. 981, 986 (E.D.Pa.1977) (citing *Kahan v. Rosenstiel*, 424 F.2d 161, 167 (3d Cir.1970)).

The Supreme Court's opinions in *Institutionalized Juveniles, Bartley v. Kremens,* and *Parham* leave no doubt that not only could plaintiffs' complaint have survived a motion to dismiss but also, the statutory and regulatory changes which mooted the plaintiffs' claims were required by the due process clause. Thus, I conclude that the plaintiffs have essentially succeeded in the legal sense.

### C. Plaintiffs' Suit Was a Catalyst For Statutory and Regulatory Change

■ The plaintiffs are not entitled to fees simply because they have received some of the relief sought. To be prevailing plaintiffs, they must also establish a causal link between the litigation and receipt of the benefit sought. The requirement of a causal link between obtaining the relief sought and the plaintiffs' lawsuit has been developed by our court of appeals in a series of cases.

In *Ross v. Horn,* the court of appeals directed the district court to determine if the plaintiff's lawsuit was "the catalyst for the implementation of all or any of the reform measures." *Ross v. Horn,* 598 F.2d 1312, 1322 (3d Cir.1979), *cert. denied,* 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980). Subsequent opinions have held that plaintiff's lawsuit need not be the exclusive catalyst of the benefit conferred upon the plaintiff. In *Staten v. Housing Authority,*

our court of appeals stated that the plaintiff had to demonstrate that her case was *a catalyst.* *Staten v. Housing Authority,* 638 F.2d 599, 605 (3d Cir.1980). The *Staten* court stated that a plaintiff can receive attorneys' fees "even if the causal link between the civil rights suit and the relief obtained is not as direct as when the case is completely adjudicated in the district court itself or formally settled with the defendants in the context of the civil rights proceeding." *Id.* at 605. *See also Sullivan v. Commonwealth of Pa.,* 663 F.2d 443, 448 (3d Cir.1981). In *Morrison v. Ayoob,* the court approved the district court's use of a "material factor" test, holding that "[w]here there is more than one cause, the plaintiff is a prevailing party if the action was a *material factor in bringing about the defendant's action."* *See Morrison v. Ayoob,* 627 F.2d 669, 671 (3d Cir.1980) (per curiam), *cert. denied,* 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981) (emphasis in the original).

■ Thus, it is apparent that the plaintiffs' suit need not have been the sole factor. *See N.A.A.C.P. v. Wilmington Medical Center,* 689 F.2d 1161, 1169 (3d Cir.1982). Rather, it must have been only a material factor which along with other factors motivated the action taken by the defendants. For the reasons stated below, I conclude that the plaintiffs' suit was a material factor in bringing about the relief obtained by the plaintiffs.

Foremost, the chronology recited above is strong evidence that plaintiffs' suit was a material factor in bringing about the relevant changes. Each legislative or regulatory change followed some significant development in this action. Other evidence supports plaintiffs' claim and rebuts any suggestion of coincidence. With respect to the 1973 Regulations, plaintiffs' counsel traveled to Harrisburg to negotiate the language of those regulations. It was originally hoped that the regulations might be a way of settling the case. *See* Exhibit D to Affidavit of David Ferleger, Esquire (Ferleger Affidavit); *see also* Ferleger Affidavit at 16. Even though the regulations did not accomplish a settlement, the plaintiffs through their counsel played an active role in the drafting of the regulations. Finally, the vice-president of Arthur Bolton Associates who was hired by the state to draft reform legislation and drafted the 1973 Regulations has stated in his affidavit that Mr. Ferleger's input on behalf of the plaintiff class was a material factor in bringing about the 1973 Regulations. *See* Affidavit of DuBois (DuBois Affidavit) ¶¶ 8 & 9. Therefore, I conclude that plaintiffs' lawsuit was a material factor in bringing about the 1973 Regulations. *See also* Affidavit of Paul Friedman, Esquire (Friedman Affidavit) at 5.

With respect to the 1976 Act and the regulations implementing it, the plaintiffs' lawsuit was also a material factor in bringing about those changes in the law. Paul Friedman, a specialist in the area of mental health law, avers that the existence of the *Institutionalized Juveniles* lawsuit created a legal atmosphere which caused the changes in Pennsylvania law to occur. *See* Friedman Affidavit at 5. W. Louis Coppersmith, a member of the Pennsylvania Senate during the pertinent period and chairman of the Senate Health and Welfare Committee, states in his affidavit that his committee which was responsible for drafting the 1976 Act did so with reference to the 1975 district court opinion in *Institutionalized Juveniles* (then called *Bartley v. Kremens*). In former Senator Coppersmith's opinion, this litigation was "an important catalyst" in bringing about the changes in Pennsylvania law. Affidavit of W. Louis Coppersmith (Coppersmith Affidavit).

The effect of this litigation on the 1976 Act goes beyond the creation of a trend in the law which collaterally affected legislative decisions. As with the 1973 Regulations, Mr. Ferleger acting on behalf of the plaintiffs had direct input into the legislative process in an effort to reconcile state law and the relief sought in this litigation. He spoke directly with Senator Coppersmith, the chairman of the Senate committee responsible for the legislation. In addition, he discussed the legislation with Mr. Fetter-

hoff of the Committee Staff. *See* Supplemental Affidavit of David Ferleger, Esquire (Supplemental Ferleger Affidavit) at 2. Mr. Ferleger states that Senator Coppersmith was responsive to his suggestions. Ferleger Affidavit at 13. Senator Coppersmith acknowledges Mr. Ferleger's input. *See* Coppersmith Affidavit. Finally, Ferleger spoke with staff members of the Arthur Bolton Associates who drafted the reform legislation at the request of the Department of Public Welfare (DPW) which became the 1976 Act. Mr. DuBois, vice-president of the Arthur Bolton Associates, credits Mr. Ferleger and plaintiffs' suit as a material factor in bringing about the 1976 Act. DuBois Affidavit ¶¶ 8 and 9.

The defendants challenge plaintiffs' contention that their suit was a catalyst for the statutory and regulatory change. The defendants rely in part upon the affidavit of Robert P. Haigh who was a DPW official at the relevant times. Mr. Haigh states in his affidavit that the plaintiffs' action was "of no particular importance" to the process which produced 1973 Regulations and the 1976 Act. Mr. Haigh states that plaintiffs' action played "no role whatsoever" in the issuance of the regulations implementing the 1976 Act.

With respect to Mr. Haigh's first statement that the suit was of no particular importance to the promulgation of the 1973 Regulations and 1976 Act, this statement acknowledges that the plaintiffs' suit played some role. The degree to which plaintiffs' suit played a role is an issue for me to decide and obviously I am not bound by Mr. Haigh's characterization. Other portions of Mr. Haigh's affidavit support my conclusion that the plaintiffs' suit was a material factor. Haigh admits that the Bolton Report played a large role in the legislative process. Haigh Affidavit at 2. Mr. DuBois's affidavit confirms that, in turn, the Bolton Report was influenced by Mr. Ferleger and this suit. The sole reason why this suit was not mentioned specifically in the report, according to Mr. DuBois, was because it was an unpopular subject with DPW.

At best, Mr. Haigh's affidavit states that the plaintiffs' lawsuit did not influence him during the legislative and regulatory process. Mr. Haigh was only one of many officials who played a role in changing Pennsylvania law. To the extent that he purports to speak to this litigation's effect on the many legislative and administrative officials involved, his statement is not based upon personal knowledge. As a participant on behalf of DPW, he is not unbiased. In addition, he is contradicted not only by Mr. Ferleger who I recognize is himself biased but also by Coppersmith and DuBois. Finally, the chronology of events rebuts his statement. For all these reasons, I reject Mr. Haigh's affidavit to the extent that he purports to speak to anything other than his own state of mind.

With respect to Mr. Haigh's second statement that the plaintiffs' suit played no part with respect to the promulgation of the regulations, I reject that statement for the reasons just stated. The regulations were an integral part of the legislative scheme of the 1976 Act. The 1978 Regulations were a further refinement of that scheme. I conclude that the plaintiffs' influence upon the regulations is established by the same evidence which established the causal link between this litigation and the 1976 Act.

The defendants properly state that it is not sufficient that the plaintiffs' suit triggered action which resulted in their obtaining the relief sought; the action resulting in the relief sought must be attributable to the defendants. The defendants argue that enactment of the 1976 Act was not an act of any of the defendants in this case. The defendants argue that they cannot be held accountable for actions taken by the legislature.

This argument has been popular with other Pennsylvania state officials. *See Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania,* 678 F.2d 470 (3d Cir.1982); *Halderman v. Pennhurst State School & Hospital,* 673 F.2d 647 (3d Cir.1982). With respect to the Secretary of DPW, I reject this argument. First, I reject it for the reasons stated in the

*Delaware Valley* and *Pennhurst* cases. In addition, I reject the argument based upon Mr. Haigh's affidavit which illustrates that DPW was extensively involved in the legislative process which resulted in the 1976 Act. DPW actively worked with the legislature to achieve passage of the 1976 Act. Its passage is properly attributable to DPW and the Secretary. DPW unquestionably is responsible for the regulations discussed since they were promulgated by it.

■ For all the reasons stated above, I conclude that based upon the statutory and regulatory changes during the pendency of this litigation plaintiffs are prevailing parties. I conclude that they essentially succeeded and that this litigation was a catalyst for the defendants' actions. The success achieved by the plaintiffs was complete upon promulgation of the 1978 Regulations on September 2, 1978. As to all hours devoted to the merits after September 2, 1978, I conclude that plaintiffs are not prevailing parties and are not entitled to an award of fees for this period.

## II. Amount of Award

I have concluded that the plaintiffs are prevailing parties within the meaning of the Fees Act. I now turn to the determination of the amount of fees to be awarded. In making this determination I have taken into account the recent Supreme Court pronouncement in this area, *Hensley v. Eckerhart,* ⎯⎯ U.S. ⎯⎯, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). I must consider how, if at all, this decision affects the "Lindy" analysis previously applied in this circuit pursuant to *Lindy I* and *II* and their progeny. *See Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973) (*Lindy I*); *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (3d Cir.1976) (*Lindy II*).

The *Lindy* line of cases sets forth a specific approach to the decision of fee petitions. Under *Lindy,* the court determines the number of hours actually worked which were reasonably necessary and contributed to the essentially successful claims. Then, the reasonable hourly rate for each attorney seeking compensation is determined. Multiplication of the hours by the rate results in the lodestar. After arriving at a lodestar, I consider whether adjustments for quality, contingency or other factors are warranted.

In my view, *Hensley* affects the *Lindy* analysis in two ways. First, it emphasizes an additional factor justifying adjustment of the lodestar, *i.e.,* the relationship between the extent of success and the amount of the fee award. ⎯⎯ U.S. at ⎯⎯, 103 S.Ct. at 1942. Second, it casts doubt on the prior opinion of the Third Circuit in *Hughes v. Repko,* 578 F.2d 483, 486–87 (3d Cir.1978) which held that the plaintiff could only recover for hours which contributed to essentially successful claims. In contrast to *Hughes,* the Supreme Court in *Hensley* approves of compensation for hours spent on unsuccessful claims which are related to successful claims.

*Hensley* speaks in terms of related and unrelated claims. The Court states that no award can be made for services on unsuccessful claims which are unrelated to the successful claim. Where, however, the unsuccessful claims are related to the successful claims either by a common core of facts or legal theories, the Court states that these unsuccessful claims may not be treated as discrete. The Court's opinion does not state that the hours devoted to the related claims must be compensated but rather that they may be. To determine whether these hours should be compensated the lower courts are directed to focus on the result obtained. If the result is excellent, all hours spent on successful claims and claims related to the successful claims should be compensated. However, if plaintiffs achieve only limited success, the compensation may be reduced. The *Hensley* Court noted that the district court could (1) eliminate specific hours which were devoted to the related unsuccessful claims, or (2) reduce the overall award. *Id.* at ⎯⎯, 103 S.Ct. at 1940. The second method is particularly useful because where the unsuccessful claims are related to the successful claims it will fre-

quently be impossible to identify a specific number of hours devoted to the unsuccessful, related claims.

The Supreme Court's discussion of related and unrelated claims may not be a repudiation of *Hughes v. Repko. Hughes* precluded awards for services rendered on unsuccessful claims as the word claim is defined in Fed.R.Civ.P. 10. *Hughes* could be understood to apply to the type of claim the Court in *Hensley* called unrelated. In any event, I shall follow the analysis set forth in *Hensley.*

The hours spent by the plaintiffs prior to September 2, 1978 were devoted to successful and unsuccessful claims which were based on a common core of facts grounded in the same legal theories. Thus, they were related as the *Hensley* Court uses that term. They are so interrelated that it is not feasible to strike specific hours from the plaintiffs' petition. Rather, as discussed below, I will make an adjustment to the lodestar to account for the limited success.

## A. *David Ferleger*

■ David Ferleger, lead counsel for the class, has represented plaintiffs in numerous legal actions in the area of mental health law. As a result his reasonable hourly rate has been litigated previously in this district. Judge Broderick wrote with respect to Mr. Ferleger's reasonable hourly rate for 1981–1982:

> David Ferleger has practiced law for approximately nine years. During that time, he has become recognized nationally as an outstanding trial counsel in legal actions designed to improve the lives of the handicapped. He has represented the plaintiff class in this litigation since its inception in 1974, and has been trial counsel in other major litigation in this district, including cases such as *Vecchione v. Wohlegemuth,* 426 F.Supp. 1297 (E.D.Pa. 1979) . . . This Court finds that the hourly rate of $105 per hour requested by Mr. Ferleger is most modest in light of his outstanding legal abilities and trial accomplishments.

*Halderman v. Pennhurst State School and Hospital,* 533 F.Supp. 649 (E.D.Pa.1982).

I agree with Judge Broderick's findings which are supported by the material submitted to me. *See* Ferleger Affidavit; Deposition of David Ferleger. I determine that Mr. Ferleger's reasonable hourly rate for the period of 1980–1981 was $95 per hour. Judge Becker while he was on the bench of the district court adjudicated Mr. Ferleger's reasonable hourly rate for earlier periods as follows: 1975—$55; 1976—$65; 1977—$70; 1978—$80; 1979—$90. Based upon the material submitted to me, I concur that these amounts represent Mr. Ferleger's reasonable hourly rate for these periods.

I must determine Mr. Ferleger's reasonable hourly rate for the period 1972–1975. In 1972, Mr. Ferleger was just beginning his legal career. His expertise as a trial lawyer in this area of the law had not yet been acquired. Nevertheless, from the outset of this litigation, Mr. Ferleger had extensive knowledge of the legal problems peculiar to the mentally disabled, gained through field research performed while he was still a law student. From the outset of the litigation he had responsibility for substantially all of the case, in court and out. I conclude that $50 per hour is Mr. Ferleger's reasonable hourly rate for the period of 1972–1975.

I am aware that Judge Newcomer adjudicated Mr. Ferleger's reasonable hourly rate to be $50 per hour for the later period of 1973–1975. However, Judge Newcomer characterized his case as "average" when making his fee determination. *See Mental Patients Civil Liberties Project v. Hospital Staff Civil Rights Committee,* No. 73–1512 (E.D.Pa. Feb. 2, 1979). *Institutionalized Juveniles* was not an "average" case. The legal questions were novel. The organization and management of the class were taxing. The state vigorously defended as is evidenced by the fact that this case was before the Supreme Court on two occasions. Accordingly, this case is distinguishable from Judge Newcomer's case.

I shall apply these historical hourly rates in determining what fee should be awarded.

The plaintiffs have suggested that I calculate the fee at Mr. Ferleger's current hourly rate. Noting the number of years that have passed since the services for which he seeks compensation were performed, Mr. Ferleger argues that an award at his current rate would compensate him for inflation. I decline to follow this course. As Judge Becker noted in *Vecchione, Lindy II* permits an adjustment to the lodestar to account for delay in receipt of payment. *Vecchione v. Wohlegemuth*, 481 F.Supp. 776, 790 (E.D.Pa.1979). This approach is preferable.

I now turn to a determination of the reasonable number of hours actually worked for which plaintiffs may be compensated. Based upon my earlier discussion of plaintiffs' status as prevailing parties, I have eliminated all hours after September 2, 1978 except for those hours Mr. Ferleger spent on his fee petition. I have closely examined the hours claimed before September 2, 1978. For the most part Mr. Ferleger's affidavit sets forth how he spent his time in sufficient detail. The times claimed appear consonant with the magnitude of the tasks described. The times are reliable since most were taken from contemporaneous time records kept by Mr. Ferleger. As to the early years of the litigation, the hours claimed are based upon a reconstruction. I approve of the method used by plaintiffs' counsel to reconstruct his time and the reconstruction appears reasonable. *See* Ferleger Affidavit ¶ 60, at 20a–20b. Nevertheless a few of the hours are claimed for tasks which are not sufficiently identified to allow me to determine whether they were reasonably necessary for success in this action. For this reason, I will reduce the award as follows: 50 hours claimed in relation to pleading 52 on page 23 of the Ferleger Affidavit are reduced to 25, all hours spent writing to and reviewing letters from the N.J. Public Advocate and Legal Services lawyers are eliminated, and .3 hour on 1/20/78 claimed for discussion with an unidentified student is eliminated.

In some cases the hours claimed appear to be excessive for the tasks listed. For this reason, I will reduce the award as follows:

accumulated time for meetings, negotiations and communications claimed on page 23 of the Ferleger Affidavit is reduced from 45 hours to 20 hours, and 38 hours spent drafting the complaint and reviewing records from 10/19/77 to 11/1/77 are reduced to 20. Finally, I will reduce the number of hours which Mr. Ferleger claims to have spent on the preparation of this fee petition because the time is not identified in detail and the amount of time appears excessive. The total number of hours in 1980–1981 sought for work on this fee petition is 41.30 hours. I shall reduce this to 13.30 hours in 1980 and 8 hours in 1981 which appears to me to be reasonable even in light of the amount of time counsel had to devote to reconstructing time spent on the early portion of this case.

After eliminating the hours mentioned above, Mr. Ferleger's lodestars may be calculated as follows:

| DATE | HOURS | X | RATE | = | SUBTOTAL |
|---|---|---|---|---|---|
| 1972–12/31/74 | 493.2 | | $50 | | 24,660.00 |
| 1975 | 22.0 | | $55 | | 1,210.00 |
| 1976 | 336.0 | | $65 | | 21,840.00 |
| 1977 | 51.3 | | $70 | | 3,591.00 |
| 1978 | 270.7 | | $80 | | 21,656.00 |
| LODESTAR – MERITS | | | | | 72,957.00 |
| 1976 | .2 | | $65 | | 13.00 |
| 1977 | .1 | | $70 | | 7.00 |
| 1980 | 13.3 | | $95 | | 1,263.50 |
| 1981 | 8.0 | | $105 | | 840.00 |
| LODESTAR – FEE PETITION | | | | | 2,123.50 |

I must next consider whether a multiplier should be applied to Mr. Ferleger's lodestar. The quality of Mr. Ferleger's work was very high. The case benefited greatly from his developing expertise. However, I have already taken these matters into account when determining his reasonable hourly rate. A multiplier based upon the quality of the work performed and the contingent nature of the success at the outset is not to be granted as a matter of course. Nevertheless, the effort put forth by counsel was unique in quality and thoroughness especially in light of the fact that Mr. Ferleger,

for all practical purposes, was sole counsel to the class. I believe a multiplier of .25 is warranted to compensate him for the quality of his work, the contingent nature of the success at the outset as well as the importance of the constitutional provisions underlying this action.

Nearly a decade passed from the time that the complaint was filed and the fee petition was fully briefed. This is a substantial period of time without compensation to plaintiffs' counsel. Few lawsuits have so long a life. As I stated previously, the law in this circuit permits an adjustment to the lodestar to compensate counsel for delay in payment. I believe that this case justifies an adjustment. I award a multiplier of .25 to compensate Mr. Ferleger for delay in payment.

Finally, as discussed above, the recent *Hensley* decision from the Supreme Court requires that I should consider the limited nature of the success achieved. At the outset the plaintiffs sought the full range of due process procedural protection for the class. They won many of these procedural rights in the district court on two occasions. The rights won in the district court stand in stark contrast to the procedures upheld by the Supreme Court. While the protections which were conferred by the statutes and regulations and upheld by the Supreme Court are significant, they are more limited than the traditional due process rights sought. The plaintiffs fell significantly short of their goal. The reduction spoken of in *Hensley* is peculiarly appropriate here. I shall reduce the lodestar awarded Mr. Ferleger by a multiplier of .50.

Finally, Mr. Ferleger has sought a separate award on account of his status as *guardian ad litem*. This status was conferred upon him to facilitate his communication with class members who were institutionalized and sometimes suffering from disabilities. It was also intended to promote cooperative discovery between the parties. The appointment of Mr. Ferleger as guardian was not intended to confer additional duties upon him beyond his obligations as class counsel. Assuming that an award based upon the appointment is permissible, it is not appropriate in this case.

### B. Penelope A. Boyd

Plaintiffs seek an award of fees for services performed by Ms. Boyd while she was a law student. Fees for law students are recoverable either as out-of-pocket expenses of the attorney retaining the law student or in their own right. *See Halderman v. Pennhurst State School and Hospital,* 533 F.Supp. 649, 655 (E.D.Pa. 1982). However, I will reject the claim in this case because it is not specific as to when the time was spent or the tasks performed. Mr. Ferleger's affidavit reveals that Ms. Boyd performed "research if [*sic*] essential and uniquely useful value." Ferleger Affidavit ¶ 59, at 20a. It also reveals that 47.0 hours of Ms. Boyd's time were spent on "Litigation in district court (discovery, trial, research drafting review of pleadings, orders and opinions)." Sixty (60) hours of Ms. Boyd's time was devoted to "Supreme Court litigation." It is impossible for me to determine from this information whether the amount of time is reasonable in light of the services performed. In light of the lack of specificity and the award already made to the plaintiffs for time Mr. Ferleger spent on these portions of the case, the fee sought for Ms. Boyd's time will be denied.

### C. Other Law Students

Plaintiffs seek an award for 470 hours expended by four law students in addition to Ms. Boyd. The names and number of these students were revealed belatedly in Mr. Ferleger's supplemental affidavit. However, even the supplemental affidavit does not provide background information on any of these students. Only a cursory statement of their duties is provided. There is nothing in the affidavit reflecting that Mr. Ferleger consulted them prior to filing this petition. Consultation may have cured the deficiencies of the petition as to them. Given the lack of specificity, I cannot determine whether the hourly rate sought for their work or the amount of

hours claimed are reasonable. Therefore, I shall deny this portion of the fee petition.

### D. *Herbert Newberg*

 Plaintiffs seek an award for the hours Mr. Newberg devoted to the prosecution of this fee petition. Time expended in preparing a fee petition may be included in the fee petition. *See Prandini v. National Tea Co.,* 585 F.2d 47 (3d Cir.1978). Where prevailing plaintiffs' counsel does not perform the fee petition work but rather has a second firm perform the work, the second firm is entitled to fees to the extent it stands in the shoes of the plaintiffs' counsel. *Shadis v. Beal,* 703 F.2d 71 (3d Cir.1983). The second firm may recover for hours spent preparing the plaintiffs' counsel's petition but may not recover for hours spent preparing its own petition. *Id.*

 Based upon *Prandini* and *Shadis,* Mr. Newberg is entitled to an award of fees since the fee petition has resulted in an award of fees to Mr. Ferleger. I have carefully reviewed the statement of hours devoted to the fee petition in Mr. Newberg's Affidavit and Supplemental Affidavit. Plaintiffs seek compensation for a total of 92.2 hours. For the most part, the hours claimed are commensurate with the services performed. Although a large number of hours were spent researching the fee petition, the issues raised by the petition fully warranted it. However, 2.5 hours claimed for a teleconference on 9/5/78 does not appear fully justified from the description given. I will reduce this to 1 hour. Two (2) hours spent on 2/20/81 preparing Mr. Newberg's own fee petition must be eliminated based upon the *Shadis* decision. I will approve 88.7 hours as reasonably necessary for the success achieved by plaintiffs on the fee petition.

I must next consider Mr. Newberg's reasonable hourly rate for work performed on the fee petition. Mr. Newberg submits that his reasonable hourly rates are $134 per hour for 9/75 to 8/78, $150 per hour for 9/78 to 8/80, and $175 per hour for 9/80 to date. I previously approved these hourly rates for work performed by Mr. Newberg

on the merits of a Title VII class action. *See Kuhn v. PECO,* 77–1107 (E.D.Pa. Jan. 20, 1982). Based upon the affidavits submitted to me, I remain satisfied that these are his reasonable hourly rates for these periods. I recognize that I may reduce the hourly rate Mr. Newberg is to receive for fee petition work. *See Lindy I & II* (recognizing that attorneys may be compensated at different rates for different activities); *Richerson v. Jones,* 506 F.Supp. 1259 (E.D. Pa.1981) (fee petition work may warrant a reduced rate). At least some of the work performed by Mr. Newberg in connection with this fee petition must have been nearly clerical in nature. However, the legal issues presented by the petition required research and analysis akin to that required by the substantive portion of the case. These legal issues complicated the petition measurably and distinguished it from the run-of-the-mill fee petition. For this reason, I will not reduce the hourly rates claimed by Mr. Newberg.

| DATE | HOURS | RATE | SUBTOTAL |
|---|---|---|---|
| 9/75 to 8/78 | 15.5 | $135 | 2,092.50 |
| 9/78 to 8/80 | 3.0 | $150 | 450.00 |
| 9/80 to date | 70.2 | $175 | 12,337.50 |
| LODESTAR | | | 14,880.00 |

The plaintiffs have not achieved complete success on the fee petition. I have reduced some hours. I have completely disallowed hours claimed for work performed by Ms. Boyd and other law students. I have rejected the plaintiffs' argument that they won new rights as a result of the Supreme Court's second opinion in this case. Despite the lack of complete success I have not eliminated specific hours from those claimed for work on the fee petition. Instead, I shall reduce the overall award for fee petition work by .125. This approach is entirely consistent with the *Hensley* decision and prior decisions of our court of appeals. I shall award the plaintiffs $13,-020.00 for Mr. Newberg's fee petition work.

### III. *Costs*

The plaintiffs seek an award of costs for the substantive portions of the case and the fee petition. The plaintiffs are prevailing

parties as to both those portions of the case. However, as I have noted above in reducing the lodestars, plaintiffs' success is limited.

Under Federal Rule of Civil Procedure 54(d), prevailing parties may receive costs absent an order from the court to the contrary. Taxation of costs in favor of the prevailing party, however, is not a matter of right. It is within the discretion of the district court. Fed.R.Civ.P. 54(d); 28 U.S.C. § 1920; 10 C. Wright, A. Miller, & M.K. Kane, Federal Practice and Procedure § 2668, at 197 (2d ed. 1983).

Exercising my discretion under the pertinent statutes, I decline to award costs to the plaintiffs. The limited nature of the success achieved convinces me that in this case it is appropriate for each side to bear its own costs.

### IV. *Summary*

I shall grant the fee petition to the extent that I shall award plaintiffs $75,080.50 for work performed by Mr. Ferleger and $13,020.00 for work performed by Mr. Newberg. In all other respects, the petition shall be denied. An appropriate order follows.